All rise. The Illinois Counsel's Court Fifth Division is now in session. The Honorable Justice Mary O'Brien is presiding. Please sit down. Good morning. Before we start, just a couple of things. We are going to lock 20 minutes aside. The appellate has an additional five minutes for rebuttal. You don't need to reserve it. And keep your voices up because this microphone records but it does not amplify. However, whenever you're ready. Would the clerk call the first case? I guess that's the first thing that's supposed to happen. 1-25-1140, Jeffrey Wagner for Certain Underwriters. Good morning, Your Honors. My name is Colleen Costello and I represent the Defendant Appellee, Certain Underwriters at Woods London. And I'll refer to it as Underwriters just because it's easier. First thing, this appeal concerns a simple insurance coverage dispute that has been made very complicated by the submissions. But really, it involves a situation where Underwriters paid. Usually we're not here when an insurer pays. But Underwriters paid the full amount of the sum benefits that are listed on the face of the policy, which was $5,800,000. Can I just ask a quick question? Is there any question about the monthly benefit and whether that had to go up because of the increase? No, that was not raised. There were, I think you probably, unless you have questions about it, there were three other disability policies that because of a provision in the disability policy. Offset.  Okay. So that wasn't an issue at all in the litigation. Okay. What will be important to the discussion about whether there was an increase of plaintiff's income is the principal sum benefit that was paid was calculated by using plaintiff's 2015 salary, which was $1,330,276. I'm not saying that right. You will. It's too much. But anyway, that is important because there's no disputes to that. That is what occurred. Because this matter involves an interpretation of an endorsement in a disability policy, plaintiff bears the burden of proving by preponderance of evidence that he is entitled to increase principal sum over the $5,800,000 that he was paid. Further, because the court did not hear live testimony and review documents, the court's review is de novo. The circuit court's January 27th. I'm sorry. The court did make credibility determinations, right? Because there was a motion for summary judgment and the court said, well, there's some issues that are genuine issues of material fact, so we need a trial. And so you had a trial on paper. But the court was then allowed to make credibility determinations on those submissions and arguments. Well, the Illinois Supreme Court says that when all the submissions are by paper and there's no live testimony, that it is a de novo review, though. Even though the court may have made that, it doesn't mean that his credibility, his decisions are given any more merit than yours, you know, because you're going to be looking at the same evidence. And then I will also say that the January 27th order was a one-pager. And there was, you know, the court reviewed not only our submissions, underwriters, but also plaintiff's 70-page, you know, submission. And when you look at that submission, there were, I don't know how that could be a careful consideration, where there were things that conflicted. Like, you know, there was different calculations. So you don't believe the ruling was long enough? What? You don't believe the ruling was long enough? Well, I would say you can say that there was a little bit more consideration. Throughout the plaintiff's paper, there were statements that there was careful consideration. I just don't see it. The court adopted the plaintiff's proposed findings of fact and conclusions of law. In a whole. In a whole. And those, that, in effect, became the court order. Right. Right. And the plaintiff had to choose which, you know, calculation that he, you know, came up with was the one that he should be awarded in his judgment. Because the court didn't make that determination. But you made the same submissions, and you were hoping that the court was going to adopt yours? Well, yes. Yes. We hope so. Or certainly we did. You know, we didn't do calculations because we believe that that should go to the, back to the cover holder who made the initial. If the court found that he met all his several, you know, burdens of proving that there was increased income. That he made the claim for the increased income prior to going unclaimed. Which, that actually, I think I don't see how that burden has been met. Let's start there. We had the Brannon emails, right? The email change. That's essentially what the court relied on. Right. Right. And what did you have that countered that? Well, are we talking about the increase of income? Are we talking about going unclaimed? Yes, exactly. The increase. Okay. So the increase in income is different than the going, prior to going unclaimed. You can start with going unclaimed if you want to. Sure. Why do you say he hadn't gone unclaimed? Well, because a plaintiff suffered his, his heart attack in 2017, November 2017. He, or 2016, I'm sorry. November 2016. And the email says that the increase was as of June of 2016. So that would mean he would be unclaimed at the time he suffered his heart attack. Well, the email would be, he would not be unclaimed. Right. All of the emails were in 2018. So that they were about something that happened in 2016, according to the emails. According to the emails, yes. But the, the going, prior to going unclaimed means you have to, underwriters have to know about the increase of. But Ann Brennan, I think her name is Ann, Brennan says in her emails, you knew this in 2016. Okay. Let's go skip ahead to the increase. And I'm just saying that she would have to counter that. Because if those emails are accepted as true, which the trial court did accept them as true, I believe. Well, in that same email, underwriters said, no, the base salary, they said, which is not the same thing as earnings. Well, he suffered his, his heart attack in 2016. Did he have his entire income determined in 2016 if his base salary was 1,300,000 per what underwriters read? You know, in November, he hasn't. The year is not over when he. My understanding from the papers is that in June, the firm does a projection of total earnings. And that's what's in the census. And that's what Ann Brennan reported to you was his projected full earnings for 2016. Right. In 2018, she reported that, which I think is important. Somehow we don't have the attachment to the email, which would resolve the issue, I think, of what numbers we're talking about. Because underwriters said it's 1,300,000. Okay. Let's start over. The base salary is different than full earnings, correct? Perhaps. But we don't really know what she was looking at. So we, the only evidence we have as to what the earnings in 2016 were was this other trial that, it was trial set at 38. And that one actually suggested that Ann Brennan may have been transposing columns when she was looking at the census. Because of the, in that one, the 1,350,000 was for an earlier year and not 2016 year. So to answer my initial question, your response to the Ann Brennan email is a suggestion that the trial court clearly didn't accept that maybe she had her numbers wrong. Yes. I do. I think that she probably had her numbers wrong. And why don't we have any corroboration other than an email and her testimony about her email? I mean, that, I mean, there are other things that plaintiff could have supplied to show his income in 2016. Why isn't there anything from his employer? Why, you know, I don't under, I will say, I, like, your honors, I, while my name was listed in the filings in the circuit court, I did not become heavily involved until the appeal. But I probably have the same questions as you. I mean, I don't know how hard it is to prove what your employers sent to underwriters in 2016. Which portion of the policy instructs how to submit these increases and how to submit claims? Which portions of the policy? The policy doesn't. It's part of the program that the employer, the employer or plaintiff obtained this policy and they would submit each year. So is there a manual then? No, no. It's part, it's just part of the program. So then who's, then who? So they submit this census and then what happens? If there is an increase and there will be a new principal sum benefit calculated. Okay, and so who's responsible for doing the, for looking at the census and saying there's an increase and then doing the calculation? Two different things. The employer is responsible for providing information saying these are partners that have had an increase in their income. But they're saying that happened, correct? An employer is not. The plaintiff's saying that he had an increase. We don't have anything from the employer. So, and you say that the insurance company is supposed to then agree? Right, right. It is up to the insurance company to then say we agree that there's been an increase and also we agree to increase the principal sum benefit and we're going to charge an additional premium. So what if you missed it because of some clerical error? I guess that's a hypothetical. You know, I suppose that they had asked and that was ignored, but that's not a fact here. They weren't asked to increase. Well, they said they sent it and you all somehow say we don't have it. Well, what we have doesn't show an increase. It just, I think that all we have is an email from a broker once plaintiff had already, you know, been on disability in 2018. So this is not the only year that this employer has had this policy. Exactly. Okay, so was the pattern in practice that they had submitted it in prior years? Right, so in 2012 was the first policy and so in 2012 plaintiff did have a lower income and in 2015 was a new policy, but it was based on the higher salary amount. So you received the information. Your client received the information for 2012, 2013, 2014, 2015. Right, well, they'll always receive the information. They'll always receive a list of, you know, partners at the firm that were on the disability policy. And received an increase. No, no, it doesn't necessarily have to be an increase. It just has the data in it. Right, and so the data will indicate, hold on one second. So that data will indicate whether there was an increase or not? Right, the data would, yes. And there would be, from just what I've seen in the emails and the brokers, I would say these partners are entitled to an increase in my opinion. And so 2016 is the only year that you're saying you don't have proof that the data was sent? We don't have the records. So the records came from the employer. The cover holder did not keep the records. How about for 2017? Well, 2017 was, did you receive the data? I don't think it was, I am not certain to be honest with you, because that wasn't part of the record I reviewed in preparing. So I'm not certain about 2017.  You had the 2016 June census report but couldn't open it? Was that, am I recalling that correctly? Correct. It was password protected. So we had two different census reports that couldn't be opened, because that password information was provided by the employer. And like I said, the employer has this information. I don't, I'm not certain why. You could have gone back to the employer and said, it's not my burden. I'm just saying if you questioned what they said that data was. Right. All we know about what that data is is what Ann Brennan put in her email. That's all anybody knows. We have an underwriter's saw too and said something different. No, it's different. That is not the same thing. If you disagree with me, tell me why. But his base salary is not the same as his income in most years. Do you disagree with that? I don't disagree with it, but we're not certain what Ann Brennan is referring to either. I don't think she refers to, she doesn't say, she just says 2016 salary. No, she doesn't say salary. She says income, total income. I don't know if she uses the word total, but she certainly doesn't say base salary, which is what you said. Right, but I think that they were basing a lot on an email exchange while plaintiff was unclaimed and without the attachments. I understand, but I'm asking you, what else is there? What else do we have? We have that. That is my point. You're saying, we're talking preponderance of the evidence. You're saying it's not even enough for preponderance. Right. That's what I'm saying. Also, I'm saying that that Exhibit 38 also shows that she could have possibly been misreading the data that was attached because of what his $1,350,000 income, I believe, was from an earlier year. Is the failure to charge the premium increase dispositive with the fact that there was no agreement? No, I don't think it's dispositive. You're saying you have to receive it, you have to agree, and then you're going to charge an increase. Right. That's the intention of the endorsement is that when an employee has an income increase, the endorsement is intended to operate that underwriters would go back and calculate that new principal sum amount and typically charge an additional premium. I think it's evidence that there was no evidence of an increase received prior to a plaintiff going on claim, though. Because if you had received it, you would have charged it. Right. And then you would have calculated the new principal sum amount. How do we deal with the argument about the surplus line defense being forfeited? I don't think it was forfeited. It was raised below. Typically, in a chancery insurance coverage case, prejudgment interest is resolved after there is a finding that something more is owed under the policy. Underwriters did object to plaintiff's proposed findings of fact, saying that the income amount was not subject to exact calculation. And also, right away after receiving the January 27th and after negotiating with plaintiff's counsel, underwriters did file an objection to their proposed judgment order and then supplied the affidavit as to it being a surplus line. I mean, you know that it was exempt from the specific statutory provision for insurance policies until you objected to the final order that was proposed. No. Well, you said it was a liquidated amount. That's true. That's true. But you're relying on the specific exemption that you never raised. So I return to Justice Wilson's question. Why isn't that too late? And your answer is? Well, I mean, typically you don't figure out whether prejudgment is owed until somebody says that you owe something more under the policy. Like I said, we paid $5,800. And, you know, at that point, then they were using an interest that was meant for admitted carriers, which underwriters certainly is not. The indicia of it not being an admitted carrier is all over the policy. It's the E&S tax that was applied. I believe that the insurance policy also says it's not an admitted carrier pursuant to that exemption. It is something that, and I will admit that insurance is complicated, especially whether something, you know, a carrier is admitted or not. But, you know, just based on my experience of being in chancery court, that is something typically that we handle, whether it's after a bench trial or after summary judgments. We typically handle the issue of whether prejudgment interest is owed at that point. But you had already argued it wasn't owed because it wasn't a liquidated amount. That argument you had made. Right. But this exemption for surplus line you didn't take. That's right. So let's just talk about the merits of that. And like you said, insurance is complicated. So you probably know this way better than we do. But I understand that Title 455.1 of the insurance code defines surplus line insurance to include only insurance in classes two, three, and four. And accident and health insurance, including disability insurance, is a class one insurance. Well, class two also includes that. So say disability could be one or two? Yes. And how do we know you're a two? Well, we're a two because the policy says it's a two. You know, with the tax, when you look at the policy, there's a stamp that says it's exempted pursuant to that, you know, section. Can you give us a page in the record? Sure. Let me go. Are you saying this is despite disability insurance-specific statutes? Yes, because there's also the two also can apply to accident and health. Let me find you a page. If you look, beginning on our Exhibit 353, Volume 2, if you look, it begins showing the indicia. Like, for instance, on E355, Volume 2, it says, Notice to Policyholder, This contract is issued pursuant to Section 445 of the Illinois Insurance Code by a company not authorized and licensed to transact business in Illinois, and as such is not covered by the Illinois Insurance Guarantee Fund. How does that answer my question? Why does that tell me it's a two, not a one? Well, that's also based on, I will explain. It's actually our first appellate brief explains that in detail. Okay. It is, but it's beginning on... In your opening brief. Yeah, yeah. It's a Class 2A. Class 2A of the insurance code includes accident and health, which is the risk insured under the disability policy. So, Class 1 is, you know, your domestic insurers that issue policies, disability policies would fall under that, but underwriters, which typically issues surplus and excess lines, actually it always does, will fall under that Class 2A. So that's why it's a surplus line. Yes. And back to the 445. So what statutory text of Section 445 applies even when Section 445-6, common signature requirements are not met? Oh, I apologize. Can you repeat your question? So what statute? We're in the statute. Okay. And Section 445 says that it applies when the 445, parenthesis 6, common signature requirements are not met. So when the common signature requirements are not met, we're in the statute says it still applies. I think that the common, I mean, in our policy, the common signature, I believe it was not, though. In our policy, if you look at the declaration that we provided, that does state that there was a common signature. Your time is up. I want to give you a very brief amount of time to address the calculations, if you want to. The calculations were, I mean, they were involved to the point of he multiplied five times his claimed income, and that, you know, he, the principal sum benefit that was on the face of the policy involved slightly less than $26,000, and it was $5,800,000. It's not intended to, you know, the endorsement doesn't say he gets five times his income. It just means that if he has an increased income, underwriters will recalculate it. It doesn't say that, but that's the intention of the endorsement, that it would be recalculated with, you know, hopefully an increased premium, because they're going to be providing more money if he is disabled. And they dismissed their bad faith claims, right? Yes. Yes. Thank you, Your Honor. Thank you. May it please the Court, Counsel. My name is Mark Tabofsky. I represent the plaintiff, Jeffrey Wagner, in this case. The appellant started out by saying that this was really a straightforward case. It isn't. The case is complicated because of Lloyd's manner in which they handled the situation and their defective drafting of the policy. We are here because even though Lloyd sold a policy that contained an automatic benefit increase endorsement, Lloyd's imposed two impediments before that automatic increase would take place. First, they demanded that Mr. Wagner apply. Well, when he called them on that, they backed off and said, no application requirement. Then they said that there had to be a significant increase, whatever that's supposed to mean. Nowhere in the policy or in the endorsement is there any indication that there needs to be a significant increase. Exhibit eight, which is the e-mail exchange that Justice Mikva referred to during appellant's presentation, there's a comment by Scott Peterson saying, not eligible. But he doesn't say why. Mr. Wagner had an increase. The number that they agreed on in the middle of 2015, which indicates that the earned income calculation was prospective, not retrospective, which is why there's no need for tax returns, K-1s or anything like that, that in June 2016, the underwriters or PIU, the cover holder, received a census from Kay Scholler that indicated what Mr. Wagner's projected earnings were going to be for earned income, not base income. Base income is always less because it only includes his projected draw for the year, and that does not include a projection for additional income for bonus and other distributions. So the e-mail is unequivocal that there was an increase, and Lloyds admitted there was an increase in their reply brief in support of their motion to dismiss. That was the judicial admission that Judge Cohn found was indeed a judicial admission and is something that this court should give deference to in that finding. Other than the judicial admission, which we can make our own decision about, you would agree that the only evidence that you presented was this Ann Brennan e-mail? No. Ann Brennan confirmed the information in her deposition. In her deposition. I'm sorry. And Jeffrey Wagner also confirmed the information in his testimony. And the only potentially countervailing evidence is Exhibit 38, and Judge Cohn clearly found that Exhibit 38 was, at best, a red herring. But it was an April 2016 census, and if you look at the document yourselves, which requires a magnifying glass because the print is so tiny, it's very clear that Ann Brennan did not make a mistake, nor did she transpose numbers from there because the numbers were completely different than the numbers that were recounted in Exhibit 8. What's your answer to counsel's suggestion that it would have been very easy for your client to go back to Kay Scholar and say, hey, can you just give me the census data for June 2016 or the passwords so that underwriters can open the census data? Why did that never happen? Apparently it didn't exist. An effort was made, but the only documentation that was obtained was evidently these password-protected censuses that nobody can unencrypt. So we're kind of stuck with what we have. But what we have is more than sufficient to show that Mr. Wagner had an increase. All right, let's talk about your calculations. Sure. How are your calculations anything other than trying to increase the 5,800,000 that you had already agreed to, your client had already agreed to? They're a recalculation, are they not, of that amount? Yes and no. Okay. Tell me why. So the $5,800,000 was apparently calculated, according to Exhibit 11, by some formula that Lloyds or that Peterson had used to sort of back into that number, which is the other reason that I was going to explain why we're here, because Lloyds drafted the policy so poorly that it's unintelligible. There's no formula to determine how the automatic increase is to be applied, even though the policy clearly includes this endorsement that says there's going to be an automatic increase if income goes up. So it's automatic kind of. It's automatic if you do this, automatic if they do that, automatic if they agree. But what we see here is that, you know, Lloyds just fell down on the job in all elements of how that increase is to be applied. They got evidence of an increase. The evidence of the increase was produced in June 2016, and even if we put aside the date of when we can say that Mr. Wagner went on claim, it's unquestionable that that information preceded the heart attack. It preceded the triggering event for the disability claim. And then the third part, agreed to, you know, then we have the problem of Lloyds contending, oh, you didn't apply. Lloyds contending you needed a substantial increase. If Lloyds had lived up to their side of the bargain and said, hey, we have this census that indicates that Mr. Wagner's income went up to $1.35 million, then they would have appropriately increased the $5,800,000 to another number. But they didn't do that. They just acted as if there had not been an increase, even though they had clear evidence that there had been. Okay. As an aside, does the circuit court adopting the findings wholesale, does that necessarily mean it was done without independent analysis? Absolutely not. Judge Cone took a considerable amount of time in considering the proposed findings of fact and conclusions of law before he adopted them. Each finding and conclusion was meticulously drafted based on the evidence before the court. And you can tell from reading the transcript of proceedings that Judge Cone really struggled with this case, but that he came to a very informed decision that was based on the evidence before it. Do you agree with the appellate that our standard of review is de novo since it was written materials? We can't disagree with Edison v. Fay, which is what it is. We can disagree, but we have to follow it. It is what it is. So you're with us. So go back to the calculations. Yes. So as far as the calculations, if you look at the findings that were adopted beginning at page, I think, 39, there are multiple potential calculations that are given.  Judge Cone found that most of them were reasonable based on the language and the policy. Is there any one of them that doesn't include a recalculation of the $5,800,000? I don't believe so. They all do, right? You see why I'm stuck on that? Because your client agreed to that number. But let me go back. So the lump sum payment was intended to simulate benefits payable to age 70. Right. Now, the way that it was done, if you look at Exhibit 11, which was created out of whole cost because there isn't anything in the policy endorsement that suggests using this calculation. But if you go back to the initial calculation and the policy endorsements, this benefit was supposed to simulate 65% of Mr. Wagner's earnings. And right off the top, they deducted $40,000 a month in earnings to get to the $32,100 figure. And that was based on other disability benefits being offset?  And then they took a second deduction to reduce that number to $5,500 a month. And where did that second deduction come from? That was from other disability insurance that Mr. Wagner had. So the calculation of $5,800 presumed that Mr. Wagner was going to receive $32,100 for that entire five-year proceeding period. And it also presumed that he was going to continue receiving disability benefits to age 70 when, in fact, the record shows that much of the coverage dropped out at age 65. Another policy dropped out at age 67. I understand why you think this $5,800 figure is wrong. I understand all of that. But it had been agreed to. So what do you say to that? There's a lot in the policy that's not spelled out, but that dollar figure is spelled out. We wouldn't be here if there hadn't been attached to that policy the automatic benefit increase endorsement. That's why that number is not a valid number. Mr. Wagner agreed to it. So if there had been no endorsement and, let's say, his earnings went to $2 million a year, he would have had no case. But that endorsement was there. That endorsement was sloppily drafted by Lloyds. That endorsement was not even followed by Lloyds, which imposed two additional conditions. And the doctrine of contraproferendum, which is so well entrenched in the jurisprudence of this State, says that Mr. Wagner is entitled to a reasonable amount of indemnity that is the best reasonable interpretation of the policy, which is how he got to the additional amount that Judge Cone found and awarded him as a judge. But they say your methodologies effectively rewrite the policy. Their methodology rewrites the policy. And since there is no methodology in the policy, the appellant's contention that this case should be remanded to Peterson International underwriters to recalculate, that unfairly gives them a second bite at the apple, since we don't know what the calculations really should be, since Lloyds failed to spell it out in their policy. Well, shouldn't they be 65% of the increase for the months that he is entitled to go into the slump? If you just take 65% of the about $1,000, a little over $1,000 a month increase, and you add that by the 158 months or whatever it's supposed to be, isn't that the logical figure? No. Why? Because the 65% was supposed to be 65% of Mr. Wagner's income. And they calculated it wrong in the 5,000,008. I get that. Yeah. But we're not trying to calculate the 5,000,008. We're trying only to calculate what's the value of the increase. How does that increase increase the principal amount? Assume that principal amount is just a made-up number. We're trying to calculate the value of the increase. But that would be to deprive Mr. Wagner of the benefit of the bargain and would negate the doctrine of contraproforendum. What is contraproforendum? Contraproforendum is the principle that the ambiguity needs to be construed in favor of the insured.  But it has to be between reasonable interpretations, correct? Correct. If there are two reasonable and one favors me and one favors you and you're the insured, it goes that way. It goes towards you.  And what Mr. Wagner laid out was that there were several reasonable interpretations of how the increase could be quantified using the formula that Lloyds recited in Exhibit 11. And that's what Judge Cohen relied on. But it seems to be taking windfall to extremes. Not at all. If anything, Mr. Wagner was deprived of what the purpose of the policy was. The purpose of the policy was to protect him in the event he suffered a career-ending illness or injury. Mr. Wagner was 54 years old when he had his heart attack and then developed narcolepsy. His earnings at that time were quite considerable. And he was looking at at least 10 more years of peak earnings, which he was deprived of. And he was supposed to get 65% of what the earnings were at the time of the disability, which itself would not be full income replacement. And then Lloyds decided to pay him a lot less than that. And Lloyds decided to ignore the automatic benefit increase endorsement that was included with the policy. So I would just like to say a word about the surplus line before I conclude. I know there's been a lot of back and forth about that. But first of all, for Lloyds to claim that this was a surplus line policy, even if they had not waived it, maybe that was their intent. But there is no countersignature from the Surplus Line Insurance Association. There was no indication of due diligence in trying to procure other coverage. And Lloyds was an admitted company at the time, Lloyds, Illinois. So why wasn't this policy written by Lloyds, Illinois, as an admitted carrier as a Class I policy? Finally, Lloyds has special status under the Illinois Insurance Code. And 215 ILCS 5-107 says that the provisions of the insurance code shall apply to Lloyds. Lloyds wrote a disability income insurance policy. There are two specific statutory provisions that provide for 9% interest on disability benefits that are not timely paid. So the court did properly apply 215 ILCS Section 5-357.9. And they also waived it, according to you. And they also waived it. But we can even put that aside for the purpose of this argument. But you agree that the certificate contains multiple surplus line indications or indicators? The stamp is on there, for sure. I can't deny that. But just because the stamp is on there doesn't make it a surplus line policy if it doesn't comply with all of the provisions of Section 445. And again, if they'd raised this earlier, perhaps it could have been fleshed out more completely if there was some question of fact as to what they were. But they raised this at a point that's too late to sort of delve into. Absolutely. But why shouldn't that aspect go back, though, at least to be fleshed out? Because, as they indicate, typically penalties and that type of thing is going to be at the end. There would be no reason, because the record and the statutes are clear that the interest provision of the Illinois Insurance Code applicable to disability insurance would apply. So the surplus line argument has no merit whatsoever. Unless the Court has additional questions?  I think we're done. Thank you. Just wanted to make a couple of points. One point was the title of the endorsement, automatic benefit increase. Since we're relying a lot on Plaintiff's Broker and Brennan here, she testified automatic is just a term of arts, which means that you do not need to submit yourself to medical underwriting. It doesn't mean that there's an automatic increase. And if we're going to rely on her so heavily with her reading of an attachment we don't have, we should also note that automatic does not mean there's an automatic increase. It means that he does not need to submit to medical underwriting. Also, the lack of a calculation in the endorsement does not render it ambiguous, because there was an intention that the new amount would be calculated pre-claim. We wouldn't be here had that happened. If there was an actual increase and it was calculated pre-claim, it would be a new endorsement to the policy that would have said, assuming that he's right there was a $20,000 increase in his salary, it would have been calculated based on that $20,000 increase. And again, show me which portion in the policy that directs how this is supposed to take place. Well, in the endorsement, it has several different, you know, limitations where it says that under our top degree there will be a premium that's calculated. It's in the endorsement. Here, let me read it to you. Well, what happens then? It's going to tell me when am I supposed to submit it, how am I supposed to submit it, who am I supposed to submit it to, who am I supposed to be waiting for agreement? Right, Your Honor. It's part of the program. The employer did submit the census each year to underwriters' cover holder. And so it's not in the policy itself. It's not part of the record here, but it is something that was understood where there was an e-mail that was sent. So when would underwriters ever then reject anything from the census? It could. Under what circumstances? So if the census was admittedly sent, what would have been a basis for underwriters to reject it and not agree? Let's say if it was a, I don't know, a small amount. Or if he received so much money that he would go over that 10 million maximum principal some benefit guaranteed issue. Or he could make for that particular year an increase of more than five times his annual income. They would reject it. They could reject it for any reason because the endorsement says it may be increased, which doesn't mean it's mandatory. But as a public policy, we don't like terms like may to be used in insurance policies. Right. That is the public policy. Respectfully, he was receiving a significant amount of sum in any event, and this was an endorsement that was added to his policy to benefit employees of K. Scholar if they had received an increase. But it doesn't mean that it would necessarily, you have to go through the steps. You have to receive, you know, underwriters need to know about it. They need to say yes. And then it would be recalculated, and we wouldn't be here. Would underwriters have said no given the circumstances that are alleged here? I don't know. I don't know. They probably wouldn't have looked to it. Do you think a policy that would have triggered a no? Definitely if he made so much money that it would have been in excess of this limit here. Would that have been the case here? Would that have been the case here? Yeah. So despite underwriters saying they didn't get it, ultimately they would have approved it anyway. They probably would have. I mean, I'm saying that if there was an increase that they received, $20,000 is a significant increase, they probably would have calculated it. And, you know, if there was a need for an additional premium, they probably would have calculated it. But this all didn't happen because this all, you know, So should we just set off the amount by the missed premium? Or should it have to be set off? No, no. It should be calculated in the same manner as it was for the $5,800,000. I understand the plaintiff doesn't think it's fair, but that's how the premium is calculated. Or, no, the amount is calculated by underwriter's cover holder. You know, because plaintiff wanted five times the salary, you know, doesn't mean he gets under the policy. He got the principal benefit sum of $5,800,000. And, you know, if he met all those other criteria, which we don't think that he did under preponderance of evidence. And, quite frankly, I do feel that the 2018 discussion concerning the endorsement and whether he had an increased amount to the salary really does mean he hasn't met his burden. I do think it's a big deal to, after the fact, after you've been disabled, to say, I get more than that $5,800,000. That is something that shouldn't be allowed under Illinois law. And, you know, he was on claim when he sought that increase. Okay, now we're going back to the beginning. We're not going to take everybody. This is certainly not simple. And I very well agree with both sides. And we'll take the matter under advisement. Thank you. All rise.